UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHIGAN INCENTIVE
REPRESENTATIVES, INC.,

    Plaintiff,                           Case No. 05-71274

v.                                     Hon. John Corbett O'Meara

SEARS, ROEBUCK AND CO.,

    Defendant.
_____/

**OPINION AND ORDER DENYING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the court is Defendant's motion for summary judgment, filed September 15, 2006.

Plaintiff submitted a response brief on October 12, 2006, and Defendant filed a reply on October

23, 2006. The court heard oral argument on January 25, 2007, and took the matter under

advisement. For the reasons set forth below, Defendant's motion is denied.

**BACKGROUND FACTS**

Plaintiff, Michigan Incentive Representatives, Inc. ("Michigan Incentive") filed this suit

against Sears, Roebuck & Co. to recover sales commissions. Plaintiff alleges that Sears

breached an agreement between the parties by failing to pay commissions on the sale of

Craftsman tools. Plaintiff has asserted claims for breach of contract, under the "procuring cause"

doctrine, and under the Michigan Sales Representatives Commission Act.[1]

Plaintiff had a relationship with Sears whereby Plaintiff would sell Craftsman tools to

corporate clients for use in marketing promotions. Sears paid Plaintiff a 5% commission for the

---

[1] Plaintiff has agreed to dismiss its claim under the Illinois Sales Representative Act.

sales Plaintiff generated.  Nobody can find a written sales commission agreement between

Plaintiff and Sears.  For the purposes of this motion, however, the parties agree that the contract

was similar to the one attached to Plaintiff's brief as Exhibit A.  The agreement provides:

> This letter is your authorization to present Craftsman products to
> prospective customers within your marketing area [Michigan], to
> be given away as business gifts, premiums or incentives.
>
> * * *
>
> Yours is the only Premium Rep firm within your Market to whom
> we shall provide sales materials, samples, leads from trade shows
> and/or advertising, and is the only Premium Rep firm in your
> marketing area that our Special Markets Manager will work with
> in the field.
>
> You will be paid a commission of 5% on all Net sales generated by
> your firm. . . .

Plaintiff's Ex. A.

Plaintiff alleges that it entered into a sub-representative agreement with MPI, another

sales representative firm.  MPI had longstanding contacts with Ford Motor Company.  Plaintiff

and MPI worked together to develop a promotion whereby Ford would purchase Craftsman tools

to give away with the purchase of a Ford truck, for example.  The idea was that Plaintiff and MPI

would arrange for Ford dealers to purchase Craftsman tools and that Plaintiff and MPI would

earn a commission from Sears.

Numerous emails went back and forth between Plaintiff and Sears regarding the

Ford/Craftsman incentive program over a period of several months in late 2003 and early 2004.

Plaintiff claims that it spent about a year pitching the idea to Ford.  In late April or May 2004,

Plaintiff's contact at Sears, Jerry Needham, was let go.  Thomas Arvia took over and was

unaware of the prior dealings between Needham and Plaintiff.  As of the time that Needham left,

it appears that there was no finalized deal between Plaintiff and Sears regarding the Ford/Craftsman program. MPI was still proposing different ideas to Ford, *e.g.*, a "Craftsman" styled F-150, or using Craftsman tools as incentives for Ford sales personnel. Ultimately, however, Plaintiff and MPI were successful in selling at least one of their ideas to some Denver region Ford dealers. Plaintiff/MPI ordered about $36,000 worth of tools from Sears that were purchased by the Denver Ford dealers. According to Sears, Plaintiff received a commission for the Denver program sales.

Around the same time, in April 2004, John Bodenmiller at Ford apparently contacted Ford's agent, A. J. Prindle, and requested that A.J. Prindle put together sales incentive programs involving tools. A. J. Prindle sought bids from several tool retailers, including Sears. Jerry Needham at Sears gave A. J. Prindle a quote and Sears won part of the business. Sears ultimately sold about $3.5 million in Craftsman tools to A. J. Prindle, who then sold them to Ford dealers for use in promotions. Sears did not pay commission to A. J. Prindle. Rather, A. J. Prindle sold the tools to the Ford dealers at a markup.

Plaintiff contends that the Sears/A. J. Prindle deal was orchestrated to leave Plaintiff and MPI out of the loop and to avoid paying them commissions on the Craftsman/Ford program. Plaintiff alleges (and emails confirm) that it had already contacted John Bodenmiller at Ford to pitch the Craftsman program shortly before Bodenmiller sought to have A. J. Prindle come up with a tools promotion. According to Plaintiff, Sears breached the exclusivity provision of their agreement by selling tools to A. J. Prindle for use in Ford promotions. Additionally, Plaintiff claims that it is entitled to commissions on the sales from Sears to A. J. Prindle, because those sales were result of Plaintiff's efforts in pitching the program to Ford.

Sears seeks summary judgment on all of Plaintiff's remaining claims – breach of contract, "procuring cause," and Michigan Sales Representative Commissions Act.

## LAW AND ANALYSIS

Plaintiff asserts that Sears breached the parties' exclusivity agreement by dealing directly with A. J. Prindle.  Plaintiff also contends that Sears breached the agreement by failing to pay commissions on the sales to A. J. Prindle.

Sears contends that it did not breach the agreement by selling to A. J. Prindle, because A. J. Prindle is not a "Premium Rep firm."  The agreement provides that Plaintiff "is the only Premium Rep firm within your market to whom we shall provide sales materials. . . . and is the only Premium Rep firm in your marketing area that our Special Markets Manager will work with in the field." Pl.'s Ex. A (emphasis added).  Sears argues that A. J. Prindle bought the tools for the Ford program outright and resold them to Ford at a markup.  A. J. Prindle did not act as a "sales representative" and did not receive a commission from Sears.

The contract does not define "Premium Rep firm," however.  Based on the agreement, it could have been reasonable for Plaintiff to expect that the Sears Special Markets Manager would only work with its firm in its "marketing area" with respect to incentive programs like Plaintiff pitched to Ford.  Otherwise, the exclusivity provision of the contract could be easily circumvented (for example, by selling directly at a discount to an agent and allowing that agent to markup the price, rather than paying a commission) and would have little meaning.  Whether the exclusivity provision of the parties' agreement was intended to bar Sears from selling directly to A. J. Prindle is a question of fact for the jury.

Plaintiff also contends that it is entitled to commission on the sales to A. J. Prindle.  Sears

-4-

argues that Plaintiff did not "generate" those sales and, therefore, is not entitled to commission under the parties' agreement.  With respect to commissions, the agreement provides as follows:

> You will be paid a commission of 5% on all Net sales <u>generated by your firm</u>.  Commissions are paid on shipments, within 30 days after the end of the month in which shipments are made, and are based upon Net sales after any credits, returns, freight, etc. . . . If you exceed $125,000 on annual basis, you will receive 7% commission retroactive to all sales from the beginning of the year.

Pl.'s Ex. A (emphasis added).  The agreement is silent with respect to post-termination commissions.

Because of the parties' exclusive agreement, the court need not determine whether Plaintiff "generated" or was the "procuring cause" of Sears' sales to A. J. Prindle.  Plaintiff may be entitled to commissions for the sales to A. J. Prindle regardless of whether it actually "procured" those sales, if the jury finds that Sears breached the exclusive agreement.  <u>See generally</u> <u>Roberts Assoc. Inc. v. Blazer Int'l Corp.</u>, 741 F. Supp. 650, 656 (E.D. Mich. 1990) ("Under an exclusive right to sell arrangement, the agent is entitled to commissions on all sales regardless of whether they are made by another agent or the principal himself.  The exclusive agent need not be the procuring cause.").[2]  Accordingly, summary judgment is not appropriate.

_____

[2] There are two types of exclusive representation agreements – "exclusive right to sell" and "exclusive agency."  <u>See</u> <u>Roberts</u>, 741 F. Supp. at 656.  An "exclusive right to sell" agreement entitles an agent to commissions on all sales regardless of whether they are made by another agent or the principal himself.  The exclusive agent need not be the procuring cause.  An "exclusive agency" agreement precludes the principal from employing other agents to sell the goods.  The principal may sell the goods himself without incurring liability to the exclusive agent, so long as the agent was not the procuring cause of the sale.  The scope of the parties' exclusive agency agreement is not clear from the contract.  Accordingly, the jury will need to decide the scope of the agency agreement and whether Sears breached it.

## **ORDER**

IT IS HEREBY ORDERED that Defendant's September 15, 2006 motion for summary

judgment is DENIED.


                                          s/John Corbett O'Meara
                                          United States District Judge


Dated: January 29, 2007


I hereby certify that a copy of the foregoing document was served upon the parties of record on this date, January 30, 2007, by electronic and/or ordinary mail.


                                          s/William Barkholz
                                          Case Manager